In re Larry Allen BECK, Peggy
Anne Beck, Debtors.

John J. HUNTER, Trustee, Plaintiff,

v.

S.K. AUSTIN CO. dba Austin Power
Equipment, Defendant.

Bankruptcy No. 81–01584.
Adv. No. 81–0895.

United States Bankruptcy Court,
N.D. Ohio, W.D.

Dec. 23, 1982.

John J. Hunter, Toledo, Ohio, trustee/plaintiff.

Richard R. Huber, Oberlin, Ohio, for defendant.

S.K. Austin Co. dba Austin Power Equipment c/o Sandra K. Austin, Statutory Agent, Norwalk, Ohio.

## MEMORANDUM AND ORDER

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on to be heard upon the Trustee's complaint to avoid an alleged preferential transfer pursuant to 11 U.S.C. § 547(b). Considering the evidence adduced at trial and the legal memoranda submitted by the parties, it is the decision of the Court that the Trustee should prevail.

## FACTUAL BACKGROUND

The Debtor, Larry Allen Beck, filed a voluntary petition under Chapter 7 of the Bankruptcy Code on August 5, 1981. For about five years prior thereto, Debtor had engaged in a farming operation which, during the summer of 1981, consisted of his active cultivation of 300 acres of farm land located in Huron County, Ohio and the raising of a small number of farm animals.

Sometime in the spring of 1981, while Debtor was planting his crops for the growing season, he developed mechanical problems with his 1967 model 1030 Case farm tractor. At this time, he initiated negotiations with Defendant, the S.K. Austin Co., Inc., to trade-in his older Case tractor for a used but later model Deutz tractor. Debtor agreed to purchase the Deutz tractor for a price of $15,000.00 if the Defendant would give him $5,000.00 in trade for his Case tractor. Debtor then set out to obtain financing for this transaction.

Debtor had an outstanding loan with the Farmer's Home Administration (FHA) under which nearly all of his assets were held as security. Badly in need of a working tractor he sought, and got tentative approval for, completion of the transaction with Defendant. Both Debtor and Defendant were given assurances from the FHA that Debtor had approval for a loan in an

amount sufficient to pay off the Deutz tractor but it was understood that it would take four to six weeks before the check would be received from FHA.

On the strength of these assurances, on or about April 10, 1981, Defendant delivered the Deutz tractor to Debtor at his farm and took possession of the Case tractor as a trade-in. This transaction was memorialized in Defendant's invoice dated April 10, 1981 that, among other things, granted Debtor a "50/50 Warranty for 30 days" and specified that "Interest will be charged at 16% annual rate." Debtor never signed, or was asked to sign, a security agreement nor was there ever any financing statement filed in connection with this transaction.

Between the time Debtor took possession of the Deutz tractor on April 10, 1981, and before Defendant repossessed on or about May 23, 1981, the FHA decided not to release any money to Debtor or Defendant to complete the transaction initiated on April 10, 1981. This reversal of intention apparently occurred as a result of their receipt of a "bad check" from Debtor in payment of his existing loan and other circumstances which brought Debtor into disfavor. FHA then informed Defendant that it should repossess the tractor delivered to Debtor on April 10, 1981 which was done on or about May 23, 1981.

Shortly after the Deutz tractor was repossessed Debtor received an invoice from Defendant dated May 26, 1981. The invoice describes charges made on Debtor's account in an amount totalling $2,600.00. Eleven hundred dollars of the balance is described as relating to parts, labor, and transportation costs for repairs Defendant made on the Case tractor it took in trade from Debtor on April 10, 1981. The remaining $1,500.00 purports to originate from Debtor's rental of the Deutz tractor from April 10, 1981 until May 23, 1981. Both Defendant and Debtor admit, however, that there had never been any previous discussion of a rental arrangement.

The testimony clearly reveals that the Deutz tractor repossessed on May 23, 1981 was substantially in as good a condition as it was when delivered in April. There had only been 30 hours of use put on it by Debtor and the market conditions were essentially similar to those in existence near the time of purchase. Nevertheless Defendant, sometime in the summer of 1981, sold the Deutz tractor to a farm implement dealer for $10,000.00 and used a portion of the proceeds to pay a $5,600.00 balance it owed to the Deutz Co. on its purchase of the tractor. As evidenced by a letter dated June 11, 1981, Debtor was given an opportunity to redeem the Case tractor Defendant took as a trade-in on the April 10, 1981 transaction but, apparently unwilling or unable to do so, Defendant sold the tractor to another company with which Debtor had previous dealings for $2,600.00. The buyer of the Case tractor later resold it for approximately $4,000.00.

The financial condition of the Debtor at the time Defendant repossessed the Deutz tractor on or about May 23, 1981, was substantially similar to what it was on August 5, 1981 when the joint petition under Chapter 7 of the Bankruptcy Code was filed. The testimony revealed that Debtor had approximately $266,000.00 in debts and only $155,000.00 in assets. Of the Debtor's assets all, or almost all of them, apparently served as security for the debtor's obligation to the FHA, an amount in excess of $200,000.00. Thus, notwithstanding any income Debtor received from his farming operations, and the $275.00 weekly wage he received from an outside job, Debtor had a negative net worth.

## DISCUSSION

Preliminarily, Defendant, in its "Amended Answer" filed April 20, 1982, in its "Answer to Amended Complaint" filed June 1, 1982, and orally at the commencement of the trial of this action on July 22, 1982, has raised objections to the jurisdiction of the Court to determine the issues raised herein in reliance on the decision of the Supreme Court of the United States in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct.

2858, 73 L.Ed.2d 598 (1982). In *Marathon* the Court concluded that the broad grant of jurisdiction to the bankruptcy courts contained in § 241(a) of the Bankruptcy Reform Act of 1978, of which 28 U.S.C. § 1471 is a part, is unconstitutional, having impermissibly removed most, if not all, of the essential attributes of the judicial power from an Article III district court and vesting them in a non-Article III adjunct. 102 S.Ct. at 2879–2880, 73 L.Ed.2d at 625. The Court stayed its judgment entered June 28, 1982 however, until October 4, 1982 to "afford congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws". 102 S.Ct. at 2880, 73 L.Ed.2d at 626. Subsequently, stay of judgment was further extended until December 24, 1982 upon the failure of Congress to enact appropriate remedial legislation before it recessed October 1, 1982.

In the aftermath of *Marathon,* the courts have adopted a number of approaches to challenges to a bankruptcy court's jurisdiction during the interim period while the judgment is stayed. A number of courts have held that the stay issued by the Supreme Court was unconditional and have continued to exercise the full breath of their authority granted under 28 U.S.C. § 1471. *See, e.g., Armco, Inc. v. Cherry Pond Coal Co. (In re Cherry Pond Coal Co.),* 21 B.R. 592, 9 B.C.D. 439 (S.D.W.Va.1982); *Rubenstein v. Sachs (In re Locarno),* 23 B.R. 622, 9 B.C.D. 813 (Bkrtcy.D.Md.1982); *Coby Glass Products Co. v. Torigian Laboratories, Inc. (In re Coby Glass Products Co.),* 22 B.R. 961, 9 B.C.D. 756 (Bkrtcy.D.R.I.1982); *Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.),* 21 B.R. 645, 9 B.C.D. 238 (Bkrtcy.D.N.M.1982); *Hasset v. Ganz (In re O.P.M. Leasing Services, Inc.),* 21 B.R. 986, 9 B.C.D. 335 (Bkrtcy.S.D.N.Y.1982). Other courts have taken a more restrictive view, declining to uphold a bankruptcy court's jurisdiction when the matter at issue arose entirely under state law. *See e.g., Citibank v. White Motor Corp. (In re White Motor Credit Corp.),* 23 B.R. 276, 9 B.C.D. 882 (N.D.Ohio 1982) (Declining to permit special master appointed by bankruptcy judge to resolve 160 product liability suits pending against debtors); *Meeker v. Livengood Real Estate Co. (In re Meeker),* 22 B.R. 745, 9 B.C.D. 836 (S.D.Ohio 1982) (Bankruptcy court does not have jurisdiction over common-law damage claim for misrepresentation and fraud). Without undertaking a thorough analysis of the above authorities, the Court concludes that, under the circumstances of this case, *Marathon* does not require dismissal.

*Marathon* involved a state common-law action for alleged breach of contract and warranty, as well as for alleged misrepresentation, coercion, and duress. In contrast, the present case involves a cause of action to set aside an alleged preferential transfer pursuant to the provisions of § 547(b) of Title 11, United States Code. As such, this is a civil proceeding arising directly under Title 11, United States Code. 28 U.S.C. § 1471(b). Furthermore, even if one were to take the more conservative view that the court was confined to the exercise of summary jurisdiction in this matter, Defendant, by failing to raise an objection thereto in its original answer on January 25, 1982, may be considered to have consented to jurisdiction. *See generally* 1 *Collier on Bankruptcy* ¶ 3.01[i] (15th Ed. 1979).

In any event, the court feels that it would be consistent with the intent if not the spirit of *Marathon* to sustain jurisdiction in this matter. The Trustee filed this action in December of 1981, nearly six months before the Supreme Court entered its judgment on June 28, 1982. By diligently pursuing the conduct of the present litigation the Trustee is performing one of his essential duties in collecting and reducing to money property of the estate. 11 U.S.C. § 704(1). The stay in *Marathon* until October 4, 1982 and its continuance until December 24, 1982 was given to promote the interim administration of the bankruptcy laws. Instead of promoting, dismissal of this case would impede the interim administration of bankruptcy laws. Consequently, the Court overrules Defendant's objection to jurisdiction.

Turning to the substantive allegations of the Trustee's complaint, the elements of a cause of action to avoid a preferential transfer are set forth in 11 U.S.C. § 547(b) as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition or;

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

There being no issues raised in the pleadings or proof as to the existence of any of the exceptions to the Trustee's power to avoid a preferential transfer under § 547(c), in the present case, it is the Trustee's burden only to prove the elements listed above, and by a fair preponderance of the evidence. *See* 4 *Collier on Bankruptcy* ¶ 547.55 at 547–160.17 (15th Ed.1979).

■ There seems to be no question in this case that there was a "transfer". Section 101(40) of the Bankruptcy Code defines transfer very broadly to include any disposition in property or an interest in property. " '[T]ransfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property, including retention of title on a security interest." 11 U.S.C. § 101(40). In the case at bar, a transfer occurred on May 23, 1981 when Defendant repossessed from Debtor the Deutz tractor it had delivered to him on April 10, 1981.

■ More substantially in issue is the question of whether the Deutz tractor that was transferred on May 23, 1981 is, or ever was, "property of the debtor". Recounting the events surrounding the transaction initiated on April 10, 1981, Defendant urges that the sale under the terms understood by the parties was "washed out" and never completed since the Debtor was unable to pay in accordance with the contract. This occurred, Defendant argues, as the result of Debtor writing a "bad check" to the FHA in payment of another unrelated debt to them and their resulting refusal to disburse the funds that they had previously assured the parties were approved. Other circumstances, such as Defendant's repossession of the Deutz tractor, Defendant's issuance of an invoice dated May 26, 1981 including rental charges for Debtor's use of the Deutz tractor, and a letter from Defendant's counsel to the FHA characterizing the transaction as an attempted sale, are offered as evidence to support this conclusion. The Court, however, disagrees both with this characterization of the parties' agreement and the inferences to be drawn from events subsequent thereto.

■ Unless the context otherwise requires, Article Two of the Uniform Commercial Code (UCC), sections 1302.01 to 1302.98 inclusive of the Ohio Revised Code, applies to transactions in goods. § 1302.02 R.C. (UCC 2–102). The Deutz tractor meeting § 1302.01(A)(8)'s [UCC 2–105(1)] definition of "goods" as a thing which is moveable at the time of identification to the contract, the Court will apply Chapter 1302. R.C. in its analysis of the transaction in issue.

The matter in issue requires that the Court determine if there was a sale of the

Deutz tractor under the circumstances of this case. "A 'sale' consists in the passing of title from the seller to the buyer for a price." § 1302.01(A)(11) R.C. [UCC 2–106(1)].

Under the provisions of § 1302.42(A) R.C. [UCC 2–401(1)] "title passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties". In the absence of such explicit agreement, however, passage of title to goods is governed by § 1302.42(B) [UCC 2–401(2)] which provides, in relevant part, as follows:

(B) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, ...

(1) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(2) if the contract requires delivery at destination, title passes on tender there.

In the present case, the Court finds that there was no explicit agreement between Debtor and Defendant, as buyer and seller respectively of the Deutz tractor, as to how and under what conditions title would pass. Defendant would, of course, prefer the Court find that the parties had agreed that payment of the purchase price was a condition precedent to passage of title but offers no evidence, such as a contract or even oral testimony, to support such a finding. Although Defendant chose to treat the transaction as a lease upon the Debtor's default in making payment, its unilateral action subsequent to breach cannot change the substance of the original agreement, or lack thereof, relating to passage of title.

On the contrary, the weight of the evidence produced seems to indicate that buyer was unconditional owner of the property subsequent to its delivery on or about April 10, 1981. The invoice prepared on April 10, 1981 firmly establishes that a purchase price of $15,000.00 was agreed on and that Debtor would receive $5,000.00 in trade for his Case tractor. Further evidencing a sale are notations on the invoice that a "50/50 warranty" would be given for thirty days and that interest, at the rate of 16% annually, would be charged from the time of delivery of the Deutz tractor until receipt of the balance of the purchase price.

Upon the finding that there was no explicit agreement between the parties as to passage of title, however, instead of weighing circumstantial evidence of their asserted intentions, the Court is permitted to apply the rule of § 1302.42(B) [UCC 2–401(2)] that "title passes to the buyer at the time and place at which the seller completes his performance with reference to physical delivery of the goods". In the present case then, title passes, and the Deutz tractor was "property of the Debtor" pursuant to 11 U.S.C. § 547(b), when Defendant's agent delivered the tractor to the Debtor's farm on or about April 10, 1981.

As a final ground for asserting that the Deutz tractor was not property of the Debtor, Defendant, in its post trial memorandum, asserts that it had a right of reclamation under § 1302.76 R.C. [UCC 2–702]. This provision provides, in relevant part, that "[w]here the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt". § 1302.76 R.C. [UCC 2–702(2)].

In the present case, Debtor received the Deutz tractor on or about April 10, 1981. Defendant repossessed the tractor more than a month later on May 23, 1981. Consequently, whatever right to reclamation Defendant may have had was lost upon failure to assert the same within 10 days of receipt of the goods. There was no evidence presented in this case of a written misrepresentation of solvency within three months before delivery to Defendant under which the ten day limitation on the right to reclaim would not apply. § 1302.76(B) R.C.

The elements of a preference under § 547(b)(1) and (2) are clearly established. Defendant has asserted a "right to payment" and therefore has a "claim" as defined by § 101(4)(A). A creditor is

defined under § 101(9)(A) as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor". Defendant's claim, as evidenced by its April 10, 1981 invoice to Debtor, arose before the order for relief on August 5, 1981 and, therefore, Defendant is a creditor. The transfer of the Deutz tractor was, thus, "to or for the benefit of a creditor" under § 547(b)(1).

■ Section 547(b)(2) requires that the transfer be "for or on account of an antecedent debt owed by the debtor before such transfer was made". The antecedency of the debt in this case is established by virtue of its creation on or about April 10, 1981, more than 30 days prior to the transfer, which occurred on May 23, 1981. The obligation of April 10, 1981 was owed by the Debtor before the transfer was made on May 23, 1981, and thus the requirements of § 547(b)(2) are clearly met.

Defendant argues that the Trustee failed to prove Debtor's insolvency at the time of the transfer as required by § 547(b)(3). On the contrary, Defendant argues, the fact that Debtor earned $275.00 a week as a maintenance man, and presumably earned additional income from his farming operation, proves he was solvent. Defendant finds further evidence of Debtor's solvency in the fact that Debtor owned a farm, farm equipment, and some assorted farm animals. In so arguing, however, Defendant necessarily either misapprehends or ignores the definition of insolvency found in § 101(26) of the Bankruptcy Code.

■ 11 U.S.C. § 101(26) defines "insolvent", in relevant part as follows:

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property, transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title; and

The trustee has the burden to prove that, at the time of the preferential transfer, the debtor's liabilities exceed his assets exclusive of property transferred, concealed, or removed with intent to hinder, delay, or defraud his creditors and exclusive of exempt property.

■ The evidence produced in this case on the question of Debtor's solvency, other than that previously recounted in relating Defendant's arguments that Debtor was solvent, was that Debtor's financial condition at the time of the transfer was substantially the same as it was on the date of the filing of the petition on August 5, 1981. As indicated from the testimony at trial and as shown in the Debtor's schedules, of which this Court takes judicial notice, at the time of the transfer on May 23, 1981 Debtor's debts totalled approximately $266,000.00 and his assets approximately $155,000.00. Although these sums should be further adjusted by including in Debtor's assets the value of the property preferentially transferred, *See* 2 *Collier on Bankruptcy* ¶ 101.26 at 101–47 (15th ed. 1979), the $15,000.00 valuation placed on the Deutz tractor, and excluding the property of the Debtor claimed as exempt, an amount shown on Debtor's Schedule B–4 to total approximately $10,000.00, the $5,000.00 increase in assets is insignificant. In sum, Debtor's liabilities in this case far exceed his assets and therefore the Trustee has shown that Debtor was insolvent at the time of the transfer in question.

■ Only brief remark need be made concerning § 547(b)(4)(A)'s requirement that the transfer be made "on or within 90 days before the date of the filing of the petition". The transfer coming on May 23, 1981, it is clearly within 90 days of the filing of the petition on August 5, 1981. Although the testimony collected from the witnesses demonstrated convincingly that Defendant did not have "reasonable cause to believe the debtor was insolvent at the time of such transfer" the absence of this proof is only relevant when, under § 547(b)(4)(B), the transfer occurred be-

tween 90 days and one year before the date of the filing of the petition if the creditor was an "insider" as defined under § 101(25).

The last element of a preference required to be proven by the trustee is that under § 547(b)(5) that the transfer

> ... enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ Under the circumstances of this case, it is clear that § 547(b)(5)'s requirements have been met. Defendant, having failed to take and perfect a security interest in the Deutz tractor, is an unsecured creditor in this case. As such, assuming the Deutz tractor would not be subject to any other valid lien, Defendant would share pro rata with Debtor's other unsecured creditors in any distribution under 11 U.S.C. § 726. Whereas the Defendant received property at the time of the transfer valued at $15,000.00 it would only share in a liquidation, at best, pro rata with unsecured claims totalling over $46,000.00. It is clear therefore that the transfer enabled Defendant to receive out of the Debtor's property more than another unsecured creditor would receive under the distributive provisions of § 726 had the transfer not been made. The test under § 547(b)(5) has thus been satisfied.

Finally, the Trustee, to the extent that a transfer is avoided under § 547, may recover either the property transferred or, if the court so orders, the value of such property. 11 U.S.C. § 550(b).

■ In the present case the Deutz tractor after being repossessed was sold to a dealer in used farm equipment. This dealer has not been shown other than to have taken the tractor for value, in good faith, and without knowledge of the voidability of the transfer avoided. Consequently, the property being unrecoverable from defendant's transferee under § 550(b), the Trustee will be limited to recovery of "the value of such property" under § 550(a).

■ The Court has been presented with conflicting evidence of the value of the Deutz tractor transferred on May 23, 1981. On the one hand, it has been shown that the property was valued at $15,000.00 as between the Defendant and Debtor when they negotiated an arms length transaction for its sale on or about April 10, 1981. Both Debtor and the president of the Defendant company testified that the tractor was in as good a condition when it was repossessed on May 23, 1981 as when it was delivered on April 10, 1981. Further, Debtor testified that market conditions for used farm equipment were substantially similar at both times.

On the opposite side, the evidence reveals that sometime later in the summer of 1981 Defendant sold the Deutz tractor it repossessed from Debtor to a dealer in used farm equipment for $10,000.00. This apparently was done to enable Defendant to pay the Deutz Company a debt of $5,600.00 it owed on its purchase of the tractor from Deutz.

Given the choice, the Court feels that $15,000.00 more appropriately represents the value of the property that the Trustee would have recovered if given the opportunity to sell the property and therefore, more approximately represents the true value of the tractor for purposes of recovery under § 550(a). The Trustee presumably could have recovered, at a private sale, an amount approximating the Deutz tractor's fair market value. The price paid by the Debtor at time of purchase, in the Court's opinion, is a fair approximation of the property's fair market value.

The sale to the used equipment dealer, on the other hand, is a less reliable test of the tractor's fair market value. The expressed motivation of Defendant in disposing of the tractor was to realize enough money to pay the debt it owed to Deutz. The tractor was sold "as is" despite the fact that Defendant's president testified that the tractor was in the same condition as when deliv-

ered to Debtor on April 10, 1981. No effort was shown to sell the tractor at an amount which would maximize the proceeds of sale.

Furthermore, other evidence indicates that Defendant may have dealt less than even handedly with Debtor during the course of this transaction. Specifically, the disposition made by Defendant of the Case tractor it took in trade on the Deutz tractor is instructive.

After making the repairs necessary to put the Case tractor in working order, Defendant, after repossessing its Deutz tractor, sent Debtor an invoice dated May 26, 1981 for $2,600.00 representing $1,100.00 in parts, labor, and transportation costs in picking up and repairing the Case tractor and $1,500.00, representing an amount assertedly due on rental of the Deutz tractor from April 10, 1981 until May 23, 1981. After allowing the Debtor a brief period within which to redeem the Case tractor by paying the May 26, 1981 invoice price of $2,600.00, Defendant sold the Case tractor to another company, admittedly, at a price sufficient only to recover the amount of its invoice. The buyer of the Case tractor, however, resold it for $4,000.00 shortly thereafter. This leads the Court to the conclusion that the Case tractor was sold at a sacrifice price. A similar disposition by Defendant of the Deutz tractor, at a sacrifice sale, may explain the reason Defendant failed to realize an amount close to its fair market value in the summer of 1981. As between the two, then, the Court concludes that $15,000.00 is a more reliable indication of the Deutz tractor's fair market value at the time of its transfer to Defendant on May 23, 1981 and, therefore, the Trustee will be permitted to recover this amount as the "value of the property".

For the foregoing reasons, it is hereby,

ORDERED that the Trustee have judgment against Defendant in the amount of $15,000.00.